IN THE UNITED STATES DISTRICT COURT
OF THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FAMILIES FOR FREEDOM, NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS' GUILD, RAFIU ABIMBOLA, and CAMAL MARCHABEYOGLU, <br><br>                                    Plaintiffs, <br><br>            v. <br><br> MICHAEL CHERTOFF, Secretary of Homeland Security, <br><br>                                    Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

1.      This is a suit under the Administrative Procedures Act ("APA"), 5 U.S.C. § 553, *et seq.*, challenging the failure of the Department of Homeland Security ("DHS") to promulgate comprehensive, enforceable regulations governing conditions in all facilities in which DHS detains immigrants.

2.      The explosive growth in immigration detention in the last several years has resulted in inconsistent conditions of confinement across the country and widespread incidents of detainee abuse, including physical and sexual mistreatment, denial of adequate health care, denial of access to legal materials and telephones, and problems in environmental health and safety.

3.      Federal immigration authorities previously adopted generalized, sub-regulatory detention standards in 1998 and 2000. However, these standards are incomplete, and are not properly implemented in order to ensure humane treatment of detainees. Existing

1

standards do not apply to detained immigrants in all facilities and, moreover, are not fully
enforceable even by those detainees to whom they do apply.

4.      In light of the rapid growth of immigration detention, and the well-documented
ineffectiveness of the agency's existing standards to ensure the humane treatment of this
expanding population, DHS should promulgate comprehensive, enforceable regulations
to ensure the uniform and humane treatment of detained immigrants in all the facilities in
which they are held.

5.      Plaintiffs in this action are former detained immigrants and immigrants' rights
organizations whose members include present and former immigration detainees.

6.      In January 2007, Plaintiffs filed a rulemaking petition requesting that DHS initiate
a rulemaking proceeding to promulgate regulations governing detention standards for
detained immigrants.

7.      Over one year later, DHS has failed to respond to the Petition.  DHS' failure to
respond constitutes an effective denial that, in light of the urgency of Plaintiffs' request
and the absence of any explanation by the agency, is arbitrary and capricious.
Consequently, Plaintiffs ask this Court to direct DHS to undertake a rulemaking and to
enact regulations governing conditions of confinement for detained immigrants within a
reasonable period of time or, in the alternative, to direct the Secretary to respond to
Plaintiffs' Petition within thirty (30) days of this Court's order.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter under 28 U.S.C. § 1331.

9.      Venue lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(e),
because Plaintiff Families for Freedom resides in this District.

## PARTIES

Plaintiffs

10.    Rafiu Abimbola is a Nigerian national who was detained for over six years at a number of detention facilities.  While detained, Mr. Abimbola suffered a number of abuses, including physical and verbal assault, denial of access to medical care, infringement on his religious freedom, inadequate food, and inadequate access to the law library.

11.    Camal Marchabeyoglu is a Lawful Permanent Resident living in Corona, California.  Mr. Marchabeyoglu was detained multiple times between 1998 and 2004 at a number of detention facilities, including El Centro and the San Diego Correctional Facility.  While detained, Mr. Marchabeyoglu suffered a number of abuses, including lack of adequate medical care and physical and verbal abuse.

12.    The National Immigration Project of the National Lawyers' Guild ("National Immigration Project") is a national, member-based, non-profit legal support group headquartered in Boston, Massachusetts, which defends the rights of immigrants facing removal and incarceration.  Members of the National Immigration Project include current and former detained immigrants who have suffered injury—namely, poor and abusive conditions in their detention facilities and the absence of any adequate means of redress—due to the lack of legally-binding regulations governing immigration detention.  The National Immigration Project is administered by a member-based Board of Directors and is partially funded through membership dues.

13.    Defendant's acts and omissions have compelled the National Immigration Project to divert resources from its legal education and legal and public advocacy programs in

order to address the lack of legally-binding regulations governing immigration detention. The lack of binding regulations has forced the National Immigration Project to dedicate additional staff time and resources to advocate on behalf of its detainee members facing substandard and abusive detention conditions through activities such as filing detainee complaints, responding to detainee correspondence, and developing materials related to detention standard violations.

14.    Families for Freedom ("FFF") is a non-profit, multi-ethnic, member-based organization based in New York, New York for detained immigrants, individuals at risk of removal, and their families.  Members of FFF include current and former detained immigrants who have suffered injury—namely, poor and abusive conditions in their detention facilities and the absence of any adequate means of redress—due to the lack of legally-binding regulations governing immigration detention.   FFF provides direct support to detainees and their families and conducts public advocacy and education on immigrants' rights.  FFF is administered by a majority-member Board of Directors and is partially-funded by grassroots, membership-based fundraising.

15.    Defendant's acts and omissions have compelled FFF to divert resources from its public advocacy and education programs in order to address the lack of legally-binding regulations governing immigration detention.  The lack of binding regulations has forced FFF to dedicate additional staff time and resources to advocate on behalf of its detainee members facing substandard and abusive detention conditions through activities such as conducting legal visits, monitoring detention conditions, filing detainee complaints, and performing advocacy with detainee members' consulates.

16.    Mr. Abimbola, Mr. Marchabeyoglu, the National Immigration Project, and FFF

were all signatories on the rule-making petition that is the subject of this suit.

<u>Defendant</u>

17.     Defendant Michael Chertoff is the Secretary of Homeland Security.  Secretary Chertoff is responsible for the implementation of law and policy related to immigration enforcement, including the treatment of detained immigrants.

## STATEMENT OF FACTS

### The Explosive Growth of Immigration Detention

18.     The responsibility to detain non-citizens accused of immigration violations rests with the Office of Detention and Removal Operations ("DRO"), a division of U.S. Immigration and Customs Enforcement ("ICE") within the Department of Homeland Security ("DHS").  ICE secures facilities while DRO carries out and monitors the detention process.

19.     Currently, ICE operates eight detention facilities, known as Service Processing Centers ("SPCs"), and contracts with eight additional facilities, known as Contract Detention Facilities ("CDFs").

20.     In addition, ICE and its predecessor, the Immigration Naturalization Service ("INS"), have contracted with state, county, and local jails to house detained immigrants via Intergovernmental Service Agreements ("IGSAs").  In recent years, this practice has been expanded to accommodate a dramatic rise in the immigrant detainee population.

21.     Detainees are also housed at Bureau of Prisons ("BOP") facilities.

22.     Some detainees deemed mentally-ill or mentally disabled are housed specifically in state psychiatric hospitals and state licensed private psychiatric hospitals.

23.     Between 1994 and 2006, the average daily population of immigrants in ICE

custody rose nearly six-fold, from 5,532 to approximately 27,607.

24.    In FY 2006, the number of individuals detained over the course of the year reached 283,000.

25.    By 2000, detained immigrants represented the fastest-growing segment of the U.S. prison population.

26.    Over time, ICE has sought additional funding and bed-space for its detention operations.

27.    Detention bed space has increased from approximately 8,300 beds in 1996 to 32,000 beds in 2008.

28.    Recently, ICE's budget for custody operations has nearly doubled from $864 million in FY 2005 to $1.65 billion in FY 2008.

29.    ICE has received budget enhancements to increase detention bed-space on an annual basis: approximately $104 million in FY 2006; $ 241 million in FY 2007 for an estimated 6,700 additional beds; and $250 million in FY 2008 for 4,150 additional detention beds, with 350 additional beds are funded within the State and local enhancement.  For FY 2009, ICE has requested an addition $46 million for 1,000 new beds.

30.    By 2006, ICE operated approximately 330 adult detention facilities nationwide.  It housed approximately 60 percent of its detainees in approximately 300 state and local jails.

31.    In addition to these adult detention facilities, in 2006, ICE contracted for the operation of 19 juvenile and 3 family detention facilities.

32.    Many of the recorded detainee abuses occur in state and local jails.

6

**Early Public Controversy about Detention Conditions**

33.    From the 1990s to the present, the scattering of detained immigrants between INS/ICE-run facilities, private facilities, and state and local jails has led to inconsistent conditions of confinement, substandard and abusive detention conditions, and widespread detainee mistreatment.

34.    Throughout the 1990s, government investigators, the media, and immigrants' rights organizations documented poor or abusive detention conditions at a number of facilities, and at local jails in particular, including verbal and physical mistreatment by prison guards, environmental health and safety issues, inadequate medical care, and denial of access to telephones and legal materials.

**The 1998 Detention Standards**

35.    Faced with these scandals and with the problem of disparate conditions of confinement more generally, INS acknowledged the need for more uniform detention standards that would be consistent with its statutory and constitutional obligations.

36.    Accordingly, in 1998, the INS issued twelve detention standards for INS Service Processing Centers and privately contracted for-profit facilities.    These standards, however, did not apply to state and local jails subject to IGSAs.

37.    Without binding detention standards applied uniformly to immigration detention facilities, inconsistencies continued to exist among various detention sites.

38.    In particular, the failure to apply standards for detained immigrants to state and local jails led to poor conditions and more frequent abuse in those facilities than in the federal-run SPCs and the CDFs.

**The 2000 Detention Operations Manual**

39.    In 2000, the INS and the Attorney General, in consultation with the American Bar Association ("ABA"), issued thirty-eight new national detention standards. These standards are contained in the Detention Operations Manual ("DOM").

40.    The DOM standards apply to SPCs, CDFs, and state and local IGSA facilities holding detainees for more than 72 hours.

41.    The DOM standards do not apply to IGSA facilities that house detainees for less than 72 hours (of which there were approximately 150 in July 2007). These facilities are subject only to abbreviated inspection by ICE.

42.    Three years later, ICE issued its Detention and Removal Strategic Plan for 2003-2012, entitled "Endgame." The second listed goal of the plan was to "provide safe, secure, and humane confinement of persons detained in accordance with immigration law." To effectuate that goal, ensuring compliance with the detention standards was emphasized.

43.    Nevertheless, a number of deficiencies in the DOM have limited its capacity to address detention standard violations.

44.    First, the DOM standards provide merely guidelines, rather than mandatory standards, for IGSA facilities.

45.    Second, the agency did not promulgate the DOM standards as regulations. Facilities that do not comply with the DOM and that lack procedures for identifying and correcting violations of the detention standards have little incentive to come into compliance and develop mechanisms for compliance review.

46.    Third, no effective enforcement mechanism exists for detainees to obtain redress of detention standard violations.

47.    Upon information and belief, ICE has never technically terminated an ISGA for noncompliance with its detention standards.

48.    Fourth, according to a December 2006 DHS Office of Inspector General ("OIG") report, many detention staff at facilities inspected by the OIG receive no training in, and have no familiarity with, the standards in the DOM.

49.    Fifth, the DOM failed to establish any ombudsman or agency liaison to whom detainees could address grievances in writing.  As a result, many abuses go unreported.

**The Widespread Violation of the DOM Standards**

50.    As a result of these deficiencies, eight years after the adoption of the DOM and four years after ICE announced its strategic plan, detention facilities across the country continue to fail fully to comply with the standards.

51.    Legal service providers, the press, human rights organizations, the U.S. Commission on International Religious Freedom, congressional testimony, and DHS's own Inspector General, have consistently reported violations of the DOM standards.

*Violations Reported in Government Audits*

52.    Violations of the DOM standards have been widely reported by DHS's own Office of the Inspector General (OIG) and by the Government Accountability Office (GAO).

53.    In December 2006, the DHS OIG produced a report based upon an audit of five detention facilities: Berks County Prison in Leesport, PA; CCA Facility in San Diego, CA; Hudson County Correction Center in Kearney, NJ; Krome Service Processing Center in Miami, FL; and Passaic County Jail in Paterson, NJ.

54.    The OIG report, entitled "Treatment of Immigration Detainees Housed at

9

Immigration and Customs Enforcement Facilities," identified multiple instances of non-compliance with the DOM at all five facilities, including inadequate health care, disciplinary procedures, and access to legal materials.

55.    For example, the OIG reported that, at three of the five audited facilities, between forty and fifty percent of all detainee non-emergency medical requests received no response within the timeframe required by the DOM standards.

56.    The OIG Report further noted that all five of the facilities had been rated as "acceptable" (and not "at risk") in ICE's most recent annual facility reviews, despite their apparent non-compliance.

57.    After the OIG's inspections and before the report was issued, ICE transferred the entire immigration detainee population at Passaic County Jail to other facilities.

58.    In July 2007, the GAO reported systematic violations of the DOM standards, including those regarding access to toll-free telephone service.

59.    The GAO found pervasive telephone access problems in detention facilities, including significant difficulties in communications with consulates, pro bono legal service providers, and the DHS Office of the Inspector General complaint hotline.

*The* Orantes *Injunction and the Inadequacy of the Detention Standards*

60.    In 1988, the U.S. District Court for the Central District of California enjoined routine violations of the rights of Salvadoran asylum-seekers in INS detention, requiring improved access to legal materials, attorneys and telephones, and due process guarantees for the processing and discipline of detainees.

61.    In 2005, DHS moved to dissolve the injunction, arguing that the 2000 DOM implemented essentially the same protections for detainees of all nationalities.

10

62.    Judge Margaret M. Morrow denied the agency's motion in nearly every respect. Reviewing voluminous evidence, the court found that there have been widespread violations in detention facilities nationwide, including lack of access to legal materials, telephones, and attorneys, and improper food and hygiene in temporary holding areas—the very concerns that necessitated the court's preliminary injunction almost two decades ago.

63.    The court observed that the DOM provides detainees with no form of redress when violations occur.

64.    Judge Morrow also rejected ICE's argument that its own internal agency audits demonstrated reasonable treatment of immigration detainees.    Instead, the court gave "considerable weight to [the] evidence that the facility reviews have underestimated—perhaps severely—violations of the standards at the various detention centers.    The ABA and UNHCR reports, for example, routinely identify deficiencies not captured by ICE facility reviewers in their annual inspections." *Orantes-Hernandez v. Gonzales*, 504 F.Supp.2d 825, 874 (C.D.Cal. 2007).

65.    Based on this extensive record, Judge Morrow found "substantial evidence . . . that detention center conditions are not so changed as to warrant dissolution" of most provisions of the original order. *Id.* at 875.    The court did dissolve two provisions of the injunction, relating to legal presentations and administrative segregation.

*Congressional Oversight Hearing*

66.    Continuing substandard and abusive detention conditions have drawn the attention of Congress as well.

67.    In particular, on October 4, 2007, the House Judiciary Committee's Subcommittee

11

on Immigration, Citizenship, Refugees, Border Security, and International Law heard testimony of advocates, experts, victims of deficient medical care in ICE detention, and relatives of people who died in ICE custody regarding the medical care of immigration detainees.  The hearing testimony described the widespread delay or denial of medical care in immigration detention due to denied because of procedural barriers and medically unjustifiable health care policies.

68.    Similarly, NGOs report that detainees held at state psychiatric hospitals or private, state-licensed psychiatric hospitals are denied visits—including legal visits—telephone, and access to legal materials, and also subject to the inappropriate use of restraints and improper administration of psychotropic medications.

**Plaintiffs' Petition for Rulemaking**

69.    On January 25, 2007, in response to pervasive abuses in detention facilities across the country, Plaintiffs petitioned DHS to promulgate comprehensive, binding regulations governing detention standards for detained immigrants.  Plaintiffs National Immigration Project and FFF petitioned on behalf of themselves and their individual members.

70.    The Petition requested that the agency initiate a rule-making procedure, publish proposed regulations for notice and comment, and promulgate detention standards as comprehensive, enforceable regulations applicable to all facilities in DHS detains immigrants.

71.    Plaintiffs explained that DHS was authorized and required to ensure proper detention conditions for immigration detainees.

72.    Plaintiffs' Petition also noted the precedent set by the U.S. Bureau of Prisons ("BOP") in promulgating binding regulations over thirty years ago.  BOP's experience

managing a national system of detention, and its decision to promulgate binding regulations, serve as an instructive model to younger agencies, like DHS, that now house tens of thousand of detainees every day in facilities across the country.

73.     Plaintiffs' Petition concluded that in light of DHS's statutory, constitutional, and international law obligations to ensure adequate detention conditions for civil detainees; the extreme variation in detention conditions across the nation; the well-documented inadequacy of the existing Detention Standards to ensure humane and safe conditions for detainees; and the foreign policy implications of widespread mistreatment of detained foreign nationals, DHS's refusal to initiate a rule-making or to promulgate regulations would be arbitrary and capricious.

**DHS's Failure to Respond**

74.     Over one year later, despite the urgency of Plaintiffs' Petition, and despite DHS's awareness of persisting substandard conditions and the failure to implement DOM standards at many of its detention facilities, neither Defendant Secretary Chertoff nor any other representative of DHS has responded to Plaintiffs' Petition for rulemaking.

75.     On August 16, 2007, Plaintiff National Immigration Project wrote to Julie L. Myers, Assistant Secretary of ICE, to inform her of DHS's failure to respond to Plaintiffs' Petition and to request a meeting to discuss DHS's position regarding the Petition.

76.     Neither Assistant Secretary Myers nor any other DHS official has responded.

**The Harm to Immigration Detainees Caused by DHS's Ongoing Inaction**

77.     As a result of DHS's unresponsiveness to Plaintiffs' Petition, immigration detainees, including members of National Immigration Project and FFF, continue to face

conditions of confinement that remain effectively unregulated.

78.     Detention facilities nationwide continue to fail to comply with the DOM, and conditions across different detention facilities continue to vary tremendously.

79.     Moreover, no effective enforcement mechanism exists for detainees to obtain redress of detention standard violations.

80.     DHS is now a mature detention agency, housing thousands of immigration detainees, directly or in contract facilities.   DHS has experimented with non-comprehensive, non-binding detention standards for years, but those standards have failed to ensure uniformity in detention conditions nationwide, to protect detainee rights, or to bring facilities into compliance with statutory and constitutional law.

81.     Like the BOP, DHS should therefore take the next evolutionary step in its efforts to manage its detention operations and assure that those in the agency's custody are confined in a secure, humane, and lawful manner.   It should initiate a rule-making process and promulgate comprehensive, enforceable regulations that will achieve basic uniformity in the treatment of immigration detainees in all the facilities in which they are held, and guarantee that minimum standards for humane treatment are honored.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Administrative Procedures Act, 5 U.S.C. § 706(1))

82.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

83.     The Administrative Procedures Act ("APA") provides a right to petition for rulemaking.  5 U.S.C. § 553(e).

84.     At a minimum, the right to petition for rulemaking entitles a party to a reasoned

14

response on the merits of the petition. 5 U.S.C. § 555(e).

85.    Such a response must occur "within a reasonable time." *Id.* at § 555(b).

86.    The APA also authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* at § 706(1).

87.    Defendant Chertoff's ongoing failure to respond to Plaintiffs' Petition constitutes unlawful withholding and/or unreasonable delay within the meaning of § 706(1).

**SECOND CLAIM FOR RELIEF**
**(Administrative Procedures Act, 5 U.S.C. § 706(2))**

88.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

89.    Defendant Chertoff, as Secretary of Homeland Security, has ultimate authority over the administration of the care and treatment of detained immigrants, pursuant to the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 *et seq.*

90.    Defendant Chertoff's failure to respond to Plaintiffs' Petition amounts to a denial that Petition and thus a final agency action under the APA.

91.    This Court may review and remedy a final agency action if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

92.    DHS's denial of Plaintiffs' Petition is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

**WHEREFORE, Plaintiffs respectfully request that this Court:**

93.    Declare that Secretary Chertoff is in violation of the APA;

94.    Direct the Secretary to initiate a rulemaking procedure and to enact regulations

covering conditions of confinement for detained immigrants within a reasonable period of time;

95.    In the alternative, direct the Secretary to respond to Plaintiffs' Petition, including an explanation of his decision and the reasons supporting it within thirty (30) days of the Court's order;

96.    Award Plaintiffs their costs and attorneys' fees incurred in bringing this action; and

97.    Grant such other relief as this Court deems just and proper.

Respectfully submitted,

Michael Wishnie, Supervising Attorney (MW1952)
Prithika Balakrishnan, Law Student Intern
Katherine Desormeau, Law Student Intern
Lindsay Nash, Law Student Intern
Marisol Orihuela, Law Student Intern
Michael Tan, Law Student Intern

JEROME N. FRANK LEGAL SERVICES ORGANIZATION
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
Fax: (203) 432-1426

Attorneys for Plaintiffs

April 30, 2008